**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-25-00343-CR**
_____

**JACOB ANDREW WILLHOITE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 221st District Court
Montgomery County, Texas
Trial Cause No. 23-09-13663

**MEMORANDUM OPINION**

A grand jury indicted Jacob Andrew Willhoite ("Willhoite" or "Appellant")

for continuous sexual abuse of Stacy,[1] a child under fourteen years of age. *See* Tex.

Penal Code Ann. § 21.02(b). Willhoite pleaded "not guilty" to the offense, but a jury

---

[1] We use pseudonyms to refer to the alleged victims and the victims' biological family and some of the other members of the family. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

1

found him guilty. After hearing punishment evidence, the jury assessed punishment at life imprisonment. The trial court sentenced Willhoite in accordance with the jury's verdict. Willhoite timely appealed.

In one issue, Willhoite argues that the State violated his due process rights under the Fourteenth Amendment of the United States Constitution by suppressing material, exculpatory evidence identifying a viable alternative perpetrator, thereby depriving Willhoite of his right to a fair trial. Specifically, in his argument he contends the trial court erred because it refused to grant him a mistrial[2] due to what he contends is an alleged *Brady*[3] violation. Finding no error, we affirm the trial court's judgment.

## Evidence at Trial[4]

At trial, Stacy's grandmother testified that Child Protective Services has been involved in her daughter Susan's life, and CPS has previously removed Susan's children from Susan's care. Stacy's mother, Susan, also testified at trial. Susan explained that she married Willhoite when Stacy was five or six years old. Susan

---

[2] On appeal, Jones complains that he was denied a fair trial because the State suppressed material which he contends was exculpatory evidence. The record does not reflect that he filed a motion for new trial, and his appellate brief does not reference the denial of his motion for continuance, so we interpret his issue on appeal as arguing that the trial court erred in denying Jones's motion for mistrial. *See* Tex. R. App. P. 33.1(a)(1)(A).

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

[4] We include an abbreviated summary of pertinent evidence at trial as necessary to provide background on the issue presented.

recalled that CPS became involved in her life when she and Willhoite had Stacy's younger half-sister, Sarah, and Stacy and Sarah went to live with Tara, Willhoite's aunt. After living with Tara for ten months, Stacy and Sarah returned to live with Susan and Willhoite at Susan's mother's house. Susan, Willhoite, Stacy, and Sarah subsequently moved into a trailer down the street from Susan's mother for a brief time, and while living there, Susan gave birth to Shelly, Stacy's second half-sister. The family lived at a hotel, the Value Inn, for a couple of weeks in August of 2015, prior to moving back to Susan's mother's house.

Susan was arrested in October of 2016, CPS became involved again, Susan left her mother's house and began dating someone else, and Susan's mother allowed Willhoite, Stacy, and Stacy's half-sisters to stay with her. Around 2017, Willhoite, Stacy, and Stacy's half-sisters moved into a trailer with Willhoite's sister, Tammy, and her three daughters. In 2018, CPS became involved again and Stacy and her half-sisters went to live with Tara and her husband.

In March 2020, when Stacy was twelve years old, Tara adopted Stacy and Stacy's half-sisters. Stacy later outcried to Tara that Willhoite had sexually abused Stacy, and Tara reported the outcry to law enforcement. A Sexual Assault Nurse Examiner (SANE) testified that on June 19, 2020, she examined Stacy and Stacy reported to her that Willhoite had "raped [her]" over the course of three years, starting when Stacy was six years old. According to the SANE, Stacy reported that

3

Willhoite had vaginal sex with Stacy, and that Willhoite licked Stacy's "privates," forced her to lick his "private part[,]" and forced her hand onto his "privates" to rub it.

Norma Carmona, a forensic interviewer at Children's Safe Harbor, testified that Stacy reported several acts of sexual abuse committed by Willhoite, and Carmona testified to the specifics of the sexual abuse as described by Stacy. According to Carmona, Stacy recalled the sexual abuse occurring at a hotel, at Susan's mother's house, at a trailer, and at Tammy's house.

Seventeen-year-old Stacy also testified in detail how Willhoite had sexually abused her at various times from when Stacy was ages six to age nine, and she recalled the sexual assaults occurred when she was at a hotel, at her grandmother's house, at a trailer they lived in which was down the street from Stacy's grandmother's house, and at Tammy's house. She testified that, when she was around twelve years old and after Tara had adopted her, she told Tara about the sexual acts Willhoite had committed.

Twenty-one-year-old Abigail testified that in the sixth grade she went to school with Tammy's daughter and stayed at Tammy's house during the summers before and after seventh grade. According to Abigail, Willhoite, who she knew of as Tammy's daughter's uncle, would "hang out[]" at Tammy's. Abigail testified that the summer after she was in seventh grade, Willhoite developed a friendship with

her which progressed to Willhoite engaging in sexual acts over a six-month period, starting when Abigail was thirteen and ending when she was fourteen. Abigail testified in detail as to the sexual acts and recalled that the acts would take place at Willhoite's house when he lived next door and also in the car. On cross-examination, Abigail testified that she lived with Tammy "off and on[]" for about five or six years, from the summer before seventh grade up until about two and a half years before trial. According to Abigail, Mitchell Fortin, Tammy's boyfriend at the time Abigail first moved in with Tammy, was already living at the house. Abigail recalled that Willhoite was at the house "constantly[]" but that Fortin was there more than Willhoite because Fortin lived there. Abigail testified that she and her boyfriend moved back in with Tammy for a brief period in 2020 and Fortin was still living there, but when she moved back in with Tammy in 2021, only Tammy, her daughters, and a four-year-old nephew lived there with them.

## Standard of Review

We review a trial court's denial of a motion for mistrial for an abuse of discretion. *Coble v. State*, 330 S.W.3d 253, 292 (Tex. Crim. App. 2010). In our review, we view the evidence in the light most favorable to the trial court's ruling. *Id.* We uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.*

5

## Analysis

In one appellate issue, Willhoite argues the State violated his due process rights under the Fourteenth Amendment of the United States Constitution by suppressing what he describes as "material, exculpatory evidence" identifying a viable alternative perpetrator, thereby depriving Willhoite of his right to a fair trial. Specifically, he argues that Mitchell Fortin was convicted of sexually abusing children while living at a home at the same time Stacy lived at the home. According to Willhoite, at trial he learned that there was a transcript of Fortin's trial and it revealed a manner of child sexual abuse similar to the allegations by Stacy against Willhoite and the abuse by Fortin occurred while they were all living at that same home, and that "the State failed to give notice of a known potential alternative perpetrator, Mitchell Fortin, who resided in the home during the relevant time period of the alleged abuse by Appellant." Willhoite contends that, due to the State's nondisclosure, his counsel was unable to interview Fortin, seek corroborating or impeachment evidence, or adjust trial strategy to present an alternative-perpetrator theory, and that the nondisclosure undermined his ability to effectively cross-examine and investigate the reliability of the State's case in violation of his due process rights. Willhoite argues that the State's nondisclosure meets the requirements to establish a *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83, 87 (1963).

At trial, after the State's direct examination of Abigail and during a bench conference, the following exchange occurred:

> [Defense counsel]: [Tammy] at one time, lived with a convicted sex offender, Mitchell Fortin, who was convicted of sexually abusing children. We didn't know about that until about ten minutes ago.
>
> [Prosecutor]: There has been no hiding that in the CPS records. There's an entire volume uploaded, all related to this. It's CPS Volume 7 that's, like, 10,000 pages.
>
> [Defense counsel]: [Fortin] was charged in the 435th, similar means [of sexual abuse]. There's a trial transcript record that I requested. I don't have it yet, but I don't know if this person was involved in that case at all or anything else.
> So, we would ask for some time at least to review that record.

The trial court allowed the defense during a lunch break to determine how much time the defense would need to review the Fortin trial transcript. After the break, the following exchange occurred:

> [Defense counsel]: . . . The State was able to email me the record from the trial of Mitchell Fortin . . . around May 8th, 2023.
> In that transcript - - I haven't been through it. There's seven volumes. I'm in Volume 4. That's the best I could do over the lunch break, but I have been able to determine that [Tammy] testified and Mitchell was her boyfriend.
> She said, in this trial testimony, that she had three children that lived with her - - she does not mention [Stacy] - - and that all those children were sexually assaulted and so were a couple of friends in a manner . . . very similar to what [Stacy] testified to.
> . . . .
> Also, all this happened in the house that [Stacy] was living in and at the same time period. There's some all[e]gations of things that happened prior, but specifically, one witness talks about February of 2018.

I would ask that we, at least, have enough time to read the seven volumes of transcripts we were given over lunch. These witnesses - - two of the witnesses that have testified here, I can, at least, determine if there's been prior inconsistent statements under oath that they can be cross-examined on.

I would, also, elicit or assert that the State elicited testimony from their detective that there was another ongoing case that was completely unrelated, that he was worried about the cooperation of these witnesses in that case. That wasn't brought out by us, and because they have . . . left that impression with the jury, we might have an alternative perpetrator theory, at least, and we may have nothing, but I need time to evaluate these prior, sworn statements that we were just given that we did not know existed until today.

We did not know that [Tammy's biological daughters] had given a forensic interview where they mentioned this guy, Mitchell.

. . . .

We didn't know the connection on this case, obviously, because they don't mention [Stacy], but based on [Stacy]'s testimony and [Tammy]'s testimony, they were living together at this time. I think it's significant enough that we be given time to research it.

. . . .

[Prosecutor]: . . . I want the record to be clear the allegations against Mitchell Fortin are extremely present in the discovery that was turned over in [Willhoite's] case file[.] Just for the record, there's a volume of CPS records entitled "CPS Records [Tammy]" that encompass the allegations and the outcry against Mitchell Fortin.

Again, it was two daughters and then, [Abigail] had a forensic interview relating to the allegation of [an act of sexual abuse by Fortin] that we just spoke of[.] Her forensic interview about that event was contained within our case file and has been turned over. . . .

In our office report that has been turned over, in this cause number in this case, on page 53, it summarizes the events relating to [Tammy]'s household with Mitchell Fortin. We asked in meetings with witnesses . . . turned over those typed meeting notes, asking if Mitchell was in the house at the same time. So, the content of those allegations is not a surprise.

Upon Defense counsel's request . . . , today - - I was able to pull a searchable case file for the trial of Mitchell Fortin, which was a public trial. His filings are public records. . . .

I want the record to be clear the content of the allegations that there was another offender offending against other kids in that same home - - I'm not as sure that the timeline overlaps. . . .

[Willhoite]'s name - - in the entirety of the trial transcript for Mitchell Fortin - - his name is stated one time, and it is stated in the context of him having moved into the home with his kids for a period of time and moved back out.

. . . .

. . . I don't want the record to reflect that this is a surprise, in its content.

[Defense counsel]: . . . an open-file policy does not satisfy the [*Brady*] requirement, and we are alleging that this is a [*Brady*] violation, that were not, specifically, told that during this time period where [Stacy] is saying that these things happen to her, she was living in the house with somebody who was, also, being alleged to have been sexually assaulting the other children in the same home.

. . . .

. . . [P]age 53 of the offense report in this case references the other detective working on the case involving Mitchell Fortin and the overlap of witnesses with this case. So, that - - combined with those forensic interviews - - does give context as to . . . what's going on with Mitchell Fortin.

The trial court concluded the proceedings for the day and allowed the defense to have the evening to review any documents.

The trial continued the next day, and the parties continued to present arguments, outside the presence of the jury, related to the alleged *Brady* violation. The defense conceded that the investigation into Mitchell Fortin was disclosed by the State in this case, but defense counsel argued that nothing in the disclosed records indicated that Fortin resided at Tammy's when Willhoite and Stacy may have lived there. The defense argued that there is now evidence that there may have been an alternate perpetrator defense that the defense was not able to develop until the State

9

provided the defense with the Fortin trial transcript the day before. The defense moved for a mistrial and, in the alternative, a continuance to develop the defense of an alternate perpetrator. The State argued that the CPS records disclosed in this case make reference to Mitchell living at Tammy's address, and the defense had access and reviewed the forensic interviews of the victims in the Fortin case, including Abigail's interview. The State also argued that the Fortin trial transcript is a public record and that the defense could have readily obtained or requested it from the State. The State also argued that Fortin's "mere possible presence in a home for a short time at the same time as the complainant does not rise to the level of [the defense] being able to articulate an alternate perpetrator. There's never been a misidentification. This is not a stranger to [Stacy]." The defense responded that the particular time when Fortin might have lived at the same residence as Stacy was not disclosed to the defense until Abigail testified that he lived there and not until the defense was provided the Fortin trial transcript.

The trial court denied the mistrial, and defense counsel notified the trial court that it would file a written motion for continuance. The State offered State's Appellate No.1, the documents contained in the State's file related to Fortin's trial, as an exhibit for appellate purposes, and the defense did not object. The trial court admitted the exhibit "for appellate purposes[.]" The defense e-filed its written motion for continuance, and the trial court denied the motion.

10

The Texas Court of Criminal Appeals in *Harm v. State* explained the requirements necessary to establish a due process violation under *Brady*:

> In *Brady*, the United States Supreme Court concluded that the suppression by the prosecution of evidence favorable to a defendant violates due process if the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. *Brady*, 373 U.S. at 87; *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). Appellant must satisfy three requirements to establish a *Brady* violation: (1) the state suppressed evidence; (2) the suppressed evidence is favorable to [the] defendant; and (3) the suppressed evidence is material. *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999); *Thomas v. State*, 841 S.W.2d 399, 402-03 (Tex. Crim. App. 1992) (citing *Moore v. Illinois*, 408 U.S. 786[] (1972)). Incorporated into the third prong, materiality, is a requirement that [the] defendant must be prejudiced by the state's failure to disclose the favorable evidence. *Banks* [*v. Dretke*], 540 U.S. [668,] 691 [(2004)].
> The Supreme Court subsequently extended *Brady* and held that the duty to disclose such evidence is applicable even if there has been no request by [the] defendant,[] and that the duty to disclose encompasses both impeachment and exculpatory evidence.[]

183 S.W.3d 403, 406 (Tex. Crim. App. 2006) (footnotes omitted). The burden lies with the accused or complainant to prove that the duty was not met. *Pitman v. State*, 372 S.W.3d 261, 264 (Tex. App.—Fort Worth 2012, pet. ref'd).

Willhoite claims "the State did not identify Appellant of the necessary materials to provide Appellant an opportunity to adequately pursue a defense based on Mitchell Fortin as an alternative perpetrator[,]" but Willhoite does not explicitly identify what "necessary materials" he claims were not provided or should have been provided. He argued at trial that the State's failure to disclose the "transcript" from Fortin's trial was a *Brady* violation and Willhoite argues on appeal that the transcript

11

provided information that could have supported that Fortin was an alternative perpetrator. Accordingly, we assume the "necessary materials" he asserts the State failed to disclose are contained in Fortin's trial transcript.

The first requirement for a *Brady* violation is whether the prosecution actively suppresses exculpatory evidence or negligently fails to disclose it. *Juarez v. State*, 439 S.W.2d 346, 348 (Tex. Crim. App. 1969); *Smith v. State*, 840 S.W.2d 689, 693 (Tex. App.—Fort Worth 1992, pet. ref'd); *see Harm*, 183 S.W.3d at 406 (A *Brady* violation occurs when the state suppresses, willfully or inadvertently, evidence favorable to the appellant). There can be no *Brady* violation without suppression of favorable evidence. *Harm*, 183 S.W.3d at 406.

As far as the first element, Willhoite does not dispute the State's point at trial or on appeal that the CPS records in this case were disclosed to and made available to Willhoite in pre-trial discovery and fully included allegations from other children of the alleged sexual abuse by Fortin against the other children. Willhoite argues that the State's argument that it fully disclosed the information about Fortin by giving them access to the CPS files is insufficient because, under *United States v. Hsia*,[5] open-file discovery does not relieve the government of its *Brady* obligations. According to Willhoite, the State knew that Fortin's case and Willhoite's case were being investigated contemporaneously, and the State willfully hid "[t]he existence

_____

[5] 24 F. Supp. 2nd 14, 30 (D.D.C. 1998).

of the possibility Mitchell Fortin[] could have been an alternative perpetrator in Appellant's case[.]"

As for Willhoite's reliance on *Hsia*, this Court is not bound by decisions of federal district or intermediate appellate courts. *See Denton v. Dep't of Pub. Safety Officers Ass'n*, 862 S.W.2d 785, 791 n.4 (Tex. App.—Austin 1993, writ granted), *aff'd*, *Tex. Dep't of Pub. Safety Officer's Ass'n v. Denton*, 897 S.W.2d 757 (Tex. 1995). Texas courts are obligated to follow only higher Texas courts and the United States Supreme Court. *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex. 1993). Generally, if the State opens its files for examination by defense counsel, it fulfills its duty to disclose *Brady* evidence. *Brewer v. State*, 126 S.W.3d 295, 305 (Tex. App.—Beaumont 2004, pet. ref'd). Additionally, when evidence is part of a public record and defense counsel should know of the evidence but fails to obtain the public records because of a lack of diligence in its own investigation, there is no *Brady* violation. *See Dalbosco v. State*, 978 S.W.2d 236, 238 (Tex. App.—Texarkana 1998, pet. ref'd) (collecting cases). "[T]he state is not required to . . . furnish appellant with exculpatory or mitigating evidence that is fully accessible to appellant from other sources. *Harm*, 183 SW.3d at 407 (citing *Jackson v. State*, 552 S.W.2d 798, 804 (Tex. Crim. App. 1976)).

Defense counsel conceded at trial that the file the State had already turned over in discovery had disclosed the State's investigation of Fortin. At trial and on

appeal, the State argues that the CPS records provided to the defense during discovery put the defense on notice of Fortin's sexual abuse of other children in Tammy's home and that the trial transcript from the case that was prosecuted against Fortin was a public record that the defense could have obtained independently. The defense does not respond to that argument.

Here, we conclude the trial court could have reasonably determined that the prosecution did not actively suppress the Fortin trial transcript, nor did the prosecution negligently fail to disclose it. *See Juarez*, 439 S.W.2d at 348; *see also Harm*, 183 SW.3d at 407; *Dalbosco*, 978 S.W.2d at 238. Furthermore, even if the State had suppressed the evidence in this case and even assuming without deciding that the Fortin trial transcript was in some way favorable to Willhoite, Appellant has not established the third element under *Brady*—that the Fortin trial transcript is material. *See Harm*, 183 S.W.3d at 406. Evidence is material if there is a "'reasonable probability that, had the evidence been disclosed to the defense, the [result] of the proceeding would have been different.'" *Ex parte Kimes*, 872 S.W.2d 700, 702 (Tex. Crim. App. 1993) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A reasonable probability is one that is sufficient to undermine confidence in the outcome of the trial. *Id.* Materiality is determined by examining the alleged error in context of the entire record and overall strength of the state's case. *Thomas*, 841 S.W.2d at 404-05 (citing *United States v. Agurs*, 427 U.S. 97, 113

(1976)). The State's case was established with Stacy's testimony, as well as other evidence. Stacy definitively identified Willhoite, her stepfather, as the person who sexually assaulted her. She made that same definitive identification when she spoke to the SANE. On this record, it was within the zone of reasonable disagreement for the trial court to conclude that there is no reasonable probability that the result of the proceedings against Willhoite would have been different if the transcript of Fortin's trial had been disclosed to Appellant prior to trial. *See Ex parte Kimes*, 872 S.W.2d at 702.

Accordingly, we conclude that the trial court did not abuse its discretion in denying Appellant's motion for mistrial. *See Coble*, 330 S.W.3d at 292. We overrule Appellant's issue on appeal, and we affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on June 24, 2026
Opinion Delivered July 29, 2026
Do Not Publish

Before Johnson, Wright and Chambers, JJ.

15